# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

ROBERT FLOYD,            )
                           )
      Plaintiff,         )
                           )
      vs.             )     Case number 4:10cv0329 TCM
                           )
MICHAEL J. ASTRUE,     )
Commissioner of Social Security,  )
                           )
      Defendant.      )

## MEMORANDUM AND ORDER

This is a 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Robert Floyd's (Plaintiff) application for supplemental security income (SSI) under Title XVI of the Social Security Act (the Act), 42 U.S.C. § 1381-1383b.[1] Plaintiff has filed a brief in support of his complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Plaintiff applied for SSI in November 2005, alleging he was disabled as of November 1, 1997, by schizophrenia, sarcoidosis, bipolar disorder, back problems, and joint pain. (R.[2] at 128-30.) His application was denied initially and after a hearing held in May 2008 before Administrative Law Judge (ALJ) Randolph E. Schum. (Id. at 7-34, 49-54.) The Appeals

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

[2]References to "R." are to the administrative record filed by the Commissioner with his answer.

Council then denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 1-3.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel,[3] and John McGowan, Ed.D., testified at the administrative hearing.

Plaintiff was 37 years old at the time of the hearing.  (Id. at 20.)  He has completed the ninth grade and had obtained a General Equivalency Degree (GED) when in prison.  (Id. at 20.)  When in school, he was in special education classes.  (Id. at 28.)  He had problems in all school subjects.  (Id.)

He has served time in the penitentiary for robbery and assault.  (Id. at 20-21.)

Plaintiff testified that he has not done much work.  (Id. at 21.)  He had worked for a cleaning company for approximately one month and had worked as a bagger at a grocery store for a few weeks when he was a teenager.  (Id. at 22.)

He has not used cocaine or alcohol for approximately two years.  (Id. at 22.)  For approximately one month, he had moved to Kentucky so a friend could help him.  (Id.)

Plaintiff had been getting regular mental health treatment but would forget his appointments.  (Id. at 23.)  He had missed his recent appointments.  (Id.)  He has been seeing his regular doctor, Dr. Gupta, once a month for sarcoidosis.[4]  (Id.)  He had had a pulmonary

---

[3]A hearing had been convened in July 2007 and again in September 2007 but had been continued each time to allow Plaintiff an opportunity to retain counsel.

[4]Sarcoidosis is "[a] systematic granulomatous disease of unknown cause, especially involving the lungs with resulting fibrosis . . . ."  Stedman's Medical Dictionary, 1571 (26th ed. 1995).  "Symptoms depend on the site of involvement and may be absent, slight, or severe."  Merck Manual

function test two or three months earlier.  (Id.)  Within the past year, he has had part of his

lung removed.  (Id. at 24.)  His sarcoidosis makes it hard for him to breathe and causes his

lungs to burn and ache.  (Id.)

Asked to describe his psychological problems, Plaintiff testified that he has been

hallucinating a lot.  (Id.)

Plaintiff has been on prednisone for at least two years.[5]  (Id. at 25.)  It causes him to

forget things and his bones to hurt.  (Id.)  He has reported this to Dr. Gupta.  (Id.)  He has

been prescribed Prozac for his mental condition but has not gotten the prescription filled.

(Id.)  He has been to the emergency room approximately three times in the past year for his

breathing problems.  (Id. at 25-26.)  He's been told to exercise, but it is hard for him to do

anything, including sitting, standing, breathing, and walking.  (Id. at 26.)  He can not sit for

longer than five minutes before his back starts hurting.  (Id.)  He then has to change positions.

(Id.)  He can not stand for longer than five minutes without it affecting his breathing and

causing back pain.  (Id. at 26-27.)  Climbing stairs also affects his breathing.  (Id. at 27.)

McGowan testified as a vocational expert (VE).

He was first asked about work a hypothetical claimant could do.  This claimant was

described as age 34 at the alleged date of onset who had a GED and no past relevant work.

(Id. at 29.)  This claimant could lift and carry up to twenty pounds occasionally and ten

pounds frequently; could sit, stand, or walk for six hours in an eight-hour workday; could

_____

of Diagnosis and Therapy, 272 (16th ed. 1992).

[5]Prednisone is used in the treatment of sarcoidosis.  Merck Manual at 275.

occasionally climb stairs and ramps but never ropes, ladders, or scaffolds; should avoid concentrated exposure to extreme cold or heat and hazards such as unprotected heights; and should avoid even moderate exposure to fumes, odors, dusts, and gases. (Id.) This claimant could understand, remember, and carry out simple instructions and non-detailed tasks; could respond appropriately to supervisors and co-workers in a task-oriented setting; should avoid constant or regular contact with the general public but could have casual and infrequent contact with others; could take appropriate precautions to avoid hazards; and should not do work involving more than infrequent handling of customer complaints. (Id.) Such a person could, according to the VE, do some small parts assembler jobs, such as hospital products; printed circuit board type work; and packaging inspector. (Id. at 30-31.) These jobs had a specific vocational preparation (SVP) level of two and were unskilled.[6] (Id.) These jobs existed in significant numbers in the state and national economies. (Id.) His testimony was

---

[6]The Eighth Circuit Court of Appeals recently observed that:

According to the regulations, unskilled work "needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a). Unskilled work is the "least complex type [ ] of work," SSR 82-41, 1982 WL 31389 (1982), corresponding to a . . . [SVP] level of one or two in the DOT. SSR 00-4P, 2000 WL 1898704 (Dec. 4, 2000). The SVP level listed for each occupation in the DOT connotes the time needed to learn the techniques, acquire the information, and develop the facility needed for average work performance. At SVP level one, an occupation requires only a short demonstration, while level two covers occupations that require more than a short demonstration but not more than one month of vocational preparation. 2 *Dictionary of Occupational Titles* app. C, at 1009 (4th ed.1991).

**Hulsey v. Astrue**, 622 F.3d 917, 922-23 (8th Cir. 2010).

consistent with the <u>Dictionary of Occupational Titles</u> (DOT) and the <u>Selected Characteristics of Occupations</u>. (<u>Id.</u> at 31.)

If, however, this claimant had a Global Assessment of Functioning of 45,[7] there were no jobs he or she could perform. (<u>Id.</u> at 31-32.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from health care providers, and assessments by examining and non-examining consultants.

When applying for SSI, Plaintiff completed a Disability Report. (<u>Id.</u> at 168-74.) He listed his height as 5 feet 11 inches tall and his weight as 170 pounds. (<u>Id.</u> at 168.) Schizophrenia, bipolar disorder, back problems, and joint pain limit his ability to work by preventing him from being able to be on his feet, to stand or bend, lift and carry things, and be around people. (<u>Id.</u> at 169.) These illnesses first bothered him in December 2004 and stopped him from working in November 1997.[8] (<u>Id.</u>) He stopped working on April 30, 2004, due to his pain and paranoia. (<u>Id.</u> at 169-70.) He has not been seen by a doctor or anyone else for the impairments, including the mental ones, that cause him to be unable to work. (<u>Id.</u>

---

[7]"According to the [DSM-IV-TR], the Global Assessment of Functioning Scale [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010). A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." <u>DSM-IV-TR</u> at 34.

[8]The discrepancy between the impairments first bothering him seven years after they stopped him from working is not explained.

at 171.)  He was incarcerated at the Missouri Eastern Correctional Facility from 1995 to 1997 and at the Licking Correctional Facility from 2000 to 2002.  (<u>Id.</u> at 172.)  These institutions had his medical records.  (<u>Id.</u>)

Plaintiff also completed a Function Report.  (<u>Id.</u> at 141-48.)  He lives alone in an apartment.  (<u>Id.</u> at 141.)  Asked to describe his daily activities, he reported that he usually stays in bed all day and watches television.  (<u>Id.</u>)  He does not like to go out because he is afraid other people, including his own family, will harm him.  (<u>Id.</u>)  His fear of other people affects his sleep.  (<u>Id.</u> at 142.)  He has difficulty dressing because he cannot bend his back or one knee and difficulty bathing because he cannot bend his back or raise his knee to get into the bathtub.  (<u>Id.</u>)  He has a hard time using the toilet because he cannot bend his knee. (<u>Id.</u>)  He sometimes needs to be reminded to change his clothes and shave.  (<u>Id.</u> at 143.)  He does not trust anyone else to prepare his meals so he often simply eats a piece of bacon and a slice of bread.  (<u>Id.</u>)  He never eats a full meal.  (<u>Id.</u>)  Sometimes, someone helps him with household chores after seeing how difficult it is for him to take care of them.  (<u>Id.</u>)  He seldom goes outside.  (<u>Id.</u> at 144.)  When he does, he walks or rides in a car.  (<u>Id.</u>)  When he does, he is often afraid that someone will hurt him.  (<u>Id.</u>)  He does not have a car or a driver's license.  (<u>Id.</u>)  He has difficulties getting along with family and friends because he is afraid they will harm him.  (<u>Id.</u> at 146.)  His impairments adversely affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, use his hands, and get along with others.  (<u>Id.</u>)  He can not lift anything without tremendous pain and strain.  (<u>Id.</u>)  He cannot walk farther than forty steps without having to stop and rest.

(Id.)  He cannot pay attention.  (Id.)  He can follow written instructions fairly well, but has difficulty following spoken instructions and forgets things if not constantly reminded.  (Id.)  He does not get along well with authority figures.  (Id. at 147.)  He's been fired for not doing what he is told.  (Id.)  He does not handle stress or changes in routine well.  (Id.)

A cousin of Plaintiff's completed a Function Report on his behalf.  (Id. at 159-67.)  She has known him for thirty-four years and sees him five to six days a week to clean and prepare meals for him.  (Id. at 159.)  He lives in an apartment with family.  (Id.)  She reminds him to dress, to bathe, and not to throw food on the floor.  (Id. at 161.)  He can fix a sandwich and cereal.  (Id.)  He takes out the trash, but needs encouragement to do so because he is afraid of being alone.  (Id.)  She does not trust him to do any house or yard work.  (Id. at 162.)  His interests include watching television and stuffed animals.  (Id.)  He cannot pay attention for longer than two minutes.  (Id. at 164.)  He does not handle stress or changes in routine well.  (Id.)

Plaintiff reported on a Pain Questionnaire that he has severe pain in his whole body.  (Id. at 140.)  He has this pain every day, all day.  (Id.)  Moving and walking make it worse.  (Id.)  He takes over-the-counter medication to relieve the pain.  (Id.)

Also, Plaintiff completed a Disability Report – Appeal form after the initial denial of his application.  (Id. at 193-201.)  Since completing the first report, he had been diagnosed in February 2006 with glaucoma and sarcoidosis, both of which he described as potentially fatal.  (Id. at 194.)  He had a loss of vision, his body ached all the time, his mental condition had worsened, and he could hardly breathe.  (Id.)  He had been to the Comprehensive Health

Center, St. Mary's Health Center, Shilpa Torton, M.D., St. Louis ConnectCare (SLCC), and St. Louis University Hospital. (Id. at 195-96.) He took three medications, including prednisone, for his eyes. (Id. at 197.)

On a list of medications, Plaintiff named Prozac, Seroquel, and prednisone. (Id. at 208.) The first two were prescribed in July 2006. (Id.)

Plaintiff had reportable annual earnings in 1987 ($591.07), 1988 ($427.88), 1990 ($74.00), 1997 ($684.76), 1999 ($1,431.70), 2002 ($1,782.00), 2003 ($463.00), and 2004 ($519.57). (Id. at 131.)

The relevant medical records before the ALJ are summarized below in chronological order and begin eight months after Plaintiff applied for SSI.

Plaintiff was seen in the emergency room at St. Mary's Health Center on March 7, 2006, for complaints of a persistent cough for one year and conjunctivitis. (Id. at 271-98.) Although he had bilateral conjunctival symptoms of pain in his eyes, his left eye had become more painful and more erythematous,[9] and he had some vision loss. (Id. at 272.) He had attempted to get some medical attention two months earlier and had some blood work done, but had not followed up. (Id.) On examination, he was in no acute distress, was alert and oriented times three, and had no edema (swelling) in his extremities. (Id.) His eye examination, particularly the left eye, was significant for perilimbic erythema and congestion. (Id. at 273.) His visual acuity was decreased to 20/200 vision in the left eye and 20/25 vision

_____

[9]Erythematous is a redness due to capillary dilation. Stedman's at 594, 595.

in the right eye. (Id.) A chest x-ray revealed perihilar lymphadenopathy[10] bilateral infiltrates. (Id.) A computed tomography (CT) scan of his thorax showed significant hilar and mediastinal adenopathy and bilateral upper lobe infiltrates. (Id.) Plaintiff was admitted, seen by an ophthalmologist, and diagnosed with uveitis[11] with decreased visual acuity and questionable secondary glaucoma in his left eye. (Id.) He was started on eye drops. (Id.) He also had hypertension. (Id.) Three days later, he was discharged on a low salt diet, given prescription eye drops, and told to followup with the pulmonary clinic at St. Louis University and with Asha Chemmalakuzhy, M.D., the doctor who had treated him during his hospital stay. (Id. at 274.)

On April 6, Plaintiff went to the emergency room at a Kentucky hospital with complaints of a cough, chest pain, shortness of air, and epigastric pain. (Id. at 428-40.) The shortness of air was constant but worse with exertion and was reproducible on touch. (Id. at 431.) It was noted that as of one month earlier, he was consuming ten to twelve beers a day. (Id.) He was diagnosed with acute bronchitis, given two prescriptions, and told to follow-up with Dr. Jeffrey Clarke. (Id. at 433-34.)

Five days later, Plaintiff returned to the emergency room when he had trouble breathing. (Id. at 419-27.) He had a frequent wheezing cough. (Id. at 421.) He was diagnosed with acute asthmatic bronchitis and instructed to use an Albuterol inhaler, take

---

[10]Lymphadenopathy is "[a]ny disease process affecting the lymph node or lymph nodes." Stedman's at 1002. Perihilar is "the area of the lung around the hilum, a triangular depression where the major arteries and airways enter and leave the rest of the lung." What is Perihilar, http://www.life123.com/question/What-Is-Perihilar (last visited Feb. 23, 2011).

[11]"Inflammation of the uveal tract; iris, ciliary body, and choroid." Stedman's at 1897.

over-the-counter Prilosec, and continue his antibiotic.  (Id. at 423.)  He was to keep his April 22 appointment with Dr. Clarke.  (Id.)

Complaining of shortness of breath, coughing, wheezing, and chest and stomach pain, Plaintiff went again to the emergency room at St. Mary's Health Center on April 23.  (Id. at 253-70.)  He had just returned home from Kentucky and was told by family members that the clinic had been trying to reach him to schedule him for tests to evaluate his pulmonary functioning.  (Id. at 268.)  He had then gone to the emergency room for the tests, where prednisone therapy was initiated and was to be continued until he had those tests. (Id. at 269.)  Chest x-rays "show[ed] significant hilar and mediastinal adenopathy."  (Id.)  An electrocardiogram (ECG) showed no evidence of ischemia.  (Id. at 270.)  He was treated with Albuterol and diagnosed with probable sarcoidosis.  (Id. at 258, 259, 264, 265.)  On discharge eight hours later, he was given a prescription for prednisone and told to stay at home that day.  (Id. at 258, 265.)

On June 9, Plaintiff telephoned the St. Mary's Medical Clinic to ask when his appointment was.[12]  (Id. at 495.)  He was informed that he had missed his appointment.  (Id.)  It was noted that he did not sound like he intended to keep his June 19 appointment with his pulmonologist.  (Id.)

_____

[12]Plaintiff had apparently been seen earlier at St. Mary's Medical Clinic because there is a completed "New Visit Form" in the record.  The date on the form is illegible.

On June 19, Eric May, a case manager at the Hopewell Center, completed an Intake Assessment for Plaintiff.[13]  (Id. at 309-13, 455-62.)  Plaintiff reported having difficulty with paranoia and expressed a preference to be alone.  (Id. at 309, 458.)  He further reported that his mental impairment became evident approximately ten years earlier.  (Id. at 310, 459.)  He was living in a house with a cousin.  (Id.)  He was unemployed, applying for disability, and receiving food stamps.  (Id.)  On examination, his eye contact was adequate, his speech was coherent, his thought association was relevant, and his sensory motor skills were acceptable and within the limits of his suspected somatic maladies.  (Id. at 312, 461.)  He denied any suicidal or homicidal ideation.  (Id.)  He reported having auditory hallucinations.  (Id.)  His memory for recent and remote events was acceptable.  (Id.)  He was alert and oriented to time, place, and person.  (Id.)  His fund of knowledge seemed to be below average in view of his incomplete secondary education.  (Id.)  His judgment and insight were diminished. (Id.)  A diagnosis of schizophrenia, paranoid type, and a GAF of 45[14] were listed.  (Id. at 313, 462.)

On July 24, Plaintiff had a psychiatric evaluation at the Hopewell Center by Alicia Gonzalez, M.D.  (Id. at 307-08, 453.)  His chief complaint was depression.  (Id. at 307.)  He reported that he had been seeing and hearing things for ten years, but it had become worse.

---

[13]Plaintiff was initially seen at the Hopewell Center on March 21, 2006, and a medication profile was then completed for him.  (Id. at 306, 314-15.)  Plaintiff reported "a chronic history of depression," paranoid ideations, and auditory and visual hallucinations; he also reported that he had been seen by a psychiatrist when confined.  (Id. at 306.)  He was to have a psychiatric evaluation and a medication evaluation that same day; however, neither appears to have occurred.  His medication profile begins with a July 2006 prescription.

[14]See note 7, supra.

(Id.)  He was appropriately dressed, coherent, relevant, cooperative, and well oriented to time, place, and person.  (Id. at 308.)  He seemed to have fair insight and judgment.  (Id.)  He had a sad facial expression and talked about being depressed with crying spells, having mood swings, and experiencing auditory and visual hallucinations.  (Id.)  He reported having suicidal ideation in the past but not currently.  (Id.)  He did not sleep through the night.  (Id.)  Dr. Gonzalez diagnosed him with major depression disorder, rule out antisocial personality disorder, and rated his GAF as 40.[15]  (Id.)  She prescribed Prozac, one tablet in the morning, and Seroquel, one tablet at bedtime.  (Id.)

Plaintiff missed his next, September visit and was sent a letter requesting that he contact the Hopewell Center and reschedule an appointment.  (Id. at 302, 453.)  That same month, Plaintiff did go to the St. Mary's Medical Clinic for a refill of his medications.  (Id. at 493-94.)  It was noted that he had last been there in March and was very noncompliant with his medication.  (Id. at 493.)  He was in no acute distress, but reported that his breathing was "not so good."  (Id.)

On November 6, Plaintiff attended the pulmonary clinic at SLCC.  (Id. at 316, 321-29, 334.)   In addition to the sarcoidosis, Plaintiff complained of shortness of breath and abdominal pain.  (Id. at 323.)  The findings on a chest x-ray and a CT scan of his chest were compatible with the diagnosis of sarcoidosis.  (Id. at 321, 327.)  There was also a concern

---

[15]A GAF score between 31 and 40 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV-TR at 34.

that he might have tuberculosis.  (Id. at 321, 325, 332.)  A sputum test was authorized to rule out this alternative diagnosis.  (Id. at 331-32.)

Subsequently, a fine needle aspiration of the lymph node in his right paratracheal, biopsies, and a bronchial washing of his right middle lobe were performed.  (Id. at 335-406.) They ruled out any malignancy.  (Id. at 338, 340.)  A diagnosis of sarcoidosis was made.  (Id. at 346.)

Plaintiff returned to the SLCC pulmonary clinic "unannounced" on December 22.  (Id. at 318-19.)  Again, the results suggested sarcoidosis.  (Id. at 318.)  He was leaving for Kentucky and wanted to take his medication with him, although he had no money to purchase same.  (Id.)  He was not given the medication because a final diagnosis had not been made and there had been no opportunity to thoroughly review the benefits and risks of the medication.  (Id.)  He was told that the therapy could begin when he returned from Kentucky and the month delay was not likely to affect the outcome.  (Id. at 318-19)

Six days later, Plaintiff went to the emergency room at the Kentucky hospital with complaints of shortness of breath, a cough, and chest pain since the biopsy.  (Id. at 407-18.) He reported that he had been recently diagnosed with sarcoidosis and needed treatment.  (Id. at 409.)  His current medications were prednisone and eye drops.  (Id.)  The pulmonologist started him on 40 milligrams a day of prednisone for one week with the dosage to be tapered down over the following week.  (Id. at 411.)

Plaintiff went to the emergency room at St. Mary's Health Center on February 5, 2007, with complaints of abdominal pain for the past six months that radiated to his chest and of

a burning chest pain.  (Id. at 237-52, 441-50.)  He had been taking Zantac, but was out of the medication.  (Id. at 238, 442.)  When the doctor went to see him, he was not in his room and was seen coming from the lunch room eating cheese fries and drinking soda.  (Id. at 246, 450.)  He was advised that he should not be eating with his epigastric pain.  (Id.)  He was given Maalox and another medication.[16]  (Id. at 238, 246, 442, 450.)  He later reported feeling better and was discharged five hours after admission.  (Id. at 246, 450.)  He did not schedule a follow-up appointment with Dr. Pooja Gupta, as requested.  (Id. at 238, 442.)

Plaintiff did, however, go to the St. Mary's Medical Clinic on February 8.  (Id. at 491-92, 504-08.)  He was described as being "extremely noncompliant" with follow-up visits and medication.  (Id. at 492.)  It was noted that he had had a lung biopsy and that refills of prescriptions would not be given until those results had been reviewed.  (Id.)  Three weeks later, Plaintiff returned, complaining of epigastric pain for the past six to seven days.  (Id. at 487-88, 502-03.)  He was started on prednisone for his sarcoidosis, prescribed Prilosec for his gastritis, advised to not drink alcohol, and referred to an ophthalmologist for his glaucoma.  (Id. at 487.)  At his next, March visit, it was noted that he was doing better since he had been compliant with his medication.  (Id. at 485-86.)  It was also noted that he needed to see an ophthalmologist for his glaucoma.  (Id. at 486.)

Plaintiff had an April 16 appointment at the Hopewell Center, but missed it.  (Id. at 302, 453.)

---

[16]The name of the medication is illegible.

When Plaintiff went to the St. Mary's Medical Clinic on May 17, he reported chest pain for the past two to three days and a productive cough. (Id. at 483-84, 500-01.) He had not been taking any medication for a few weeks because he had been in jail. (Id. at 483.) He was started again on prednisone. (Id. at 484.)

Plaintiff returned to the Hopewell Center on May 31, explaining that he had moved to Kentucky and had had no treatment since. (Id. at 300-01, 452, 454.) He was again feeling depressed and hearing voices telling him to hurt other people. (Id. at 301, 452.) He did not act on the voices' instructions. (Id.) His sleep was restless. (Id.) He had applied for SSI and had missed two hearing dates. (Id.) He was casually groomed; alert and oriented times two; talked to himself; and was overwhelmed and stressed. (Id.) He saw Dr. Gonzalez, who prescribed Prozac and Seroquel. (Id. at 300, 454.)

It was noted at Plaintiff's June visit to Dr. Gupta at St. Mary's Medical Clinic that he had been compliant with his medication. (Id. at 481-82.) His breathing was better and he had no cough. (Id. at 481.) He did have some mild epigastric pain, probably due to the prednisone. (Id. at 481-82.) Medication was helping. (Id. at 482.) He had some redness in his eyes and blurred vision; he was to be referred to the eye clinic at SLCC. (Id. at 481-82.) At his next, July visit, Plaintiff continued to be complaint with his medication. (Id. at 489-90.) He complained of redness in his eyes, photophobia, and pain in his eyes on movement. (Id. at 489.)

In August, Plaintiff went to the St. Mary's Medical Clinic with complaints of a headache and toothache. (Id. at 476-78.) He was to have a tooth extracted that month at

Christian Hospital Northeast.  (Id. at 476.)  He was doing well with the sarcoidosis; his dosage of prednisone was reduced.  (Id.)  His gastritis was better.  (Id.)

Plaintiff went to the St. Mary's Medical Clinic on December 20 with complaints of increasing shortness of breath and a minimal dry cough.  (Id. at 474-75.)  It was noted that he was "very noncompliant" with his medications.  (Id. at 475.)  He was restarted on his prednisone.  (Id.)  A subsequent pulmonary function analysis revealed decreased FVC and FEV-1, a 2.82, with a normal FEV-1 to FVC ratio.[17]  (Id. at 463-66.)  There was no acute bronchodilator response.  (Id.)  DLco[18] was normal.  (Id. at 465.)  It was noted that there had been a significant increase in timed flows and lung volume.  (Id.)  A CT scan of his thorax revealed mild hilar and mediastinal adenopathy and bilateral upper lobe changes consistent with fibrosis.  (Id. at 468-69.)

On January 16, 2008, Plaintiff went to the St. Mary's Medical Clinic with complaints of a cough for the past week, a headache, chills, and sweating.  (Id. at 471-72.)  A nephew had been sick at home.  (Id. at 471.)  Dr. Gupta prescribed a six-day course of medication for his cough, started him on 30 milligrams of prednisone to be tapered to 10 milligrams, and diagnosed with him gastritis, noting that he continued to drink three cans of 25 ounce beer. (Id. at 472.)

Various assessments of Plaintiff were also before the ALJ.

---

[17]FVC is forced vital capacity; FEV-1 is the volume of air forcefully expired during the first second after a full breath.  Merck Manual at 608, 610.

[18]Dlco is the diffusing capacity for carbon monoxide.  Merck Manual at 614.  "A low Dlco probably reflects abnormal ventilation/perfusion ratios."  Id.

Pursuant to his application, Plaintiff had a physical evaluation in December 2005 by Elbert H. Cason, M.D. (Id. at 222-28.) His primary complaints were upper and lower back pain, pain in all joints, and mental problems. (Id. at 222.) His back pain he had had for years. (Id.) There was no injury. (Id.) He could not afford a doctor and took Tylenol. (Id.) Dr. Cason noted that Plaintiff had been slouched in the chair with his legs outstretched – a position he described as being very painful if a person had a painful back. (Id.) Plaintiff stated that his joint pain prevented him from walking farther than two blocks and sitting or standing for longer than five minutes. (Id.) He could lift five pounds. (Id.) He did not use an assistive device when walking. (Id.) He lived with an aunt. (Id.) He did not do any household chores, but lay down all day. (Id.) He did not watch television and did not read. (Id.) Mostly, he slept. (Id.) He was 63[19] inches tall and weighed 143 pounds – a normal weight for his height. (Id. at 223.) On examination, he "[was] very reluctant to move his back when asked to. He had paravertebral lumbar area tenderness in the entire back . . . ." (Id.) When Dr. Cason "just touched his skin on the back area he would jump which is an exaggerated response." (Id.) His straight leg raises were decreased.[20] (Id.) He had no clubbing, cyanosis, or edema in his extremities. (Id.) He could heel and toe stand and squat by holding on to the edge of the table. (Id.) His gait and station were normal without the use

_____

[19]This appears to be an error. Plaintiff reported his height as 5 feet 3 inches, or 73 inches.

[20]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

of any assistive devices.  (<u>Id.</u>)  Flexion-extension of his lumbar spine was 60 degrees.  (<u>Id.</u> at 223, 228.)  Lateral flexion was 10 degrees.  (<u>Id.</u> at 223-24, 228.)  Cervical spine motions were normal, as were ankle, wrist, and elbow motions.  (<u>Id.</u> at 224.)  Knee motions were 90 degrees in the right and left legs "with a very poor effort."  (<u>Id.</u>)  "Major muscle group strengths of the upper and lower extremities were 4/5 bilaterally with a very poor effort."  (<u>Id.</u> at 224.)  "Grip strengths were normal at 4/5 bilaterally with a very poor effort."  (<u>Id.</u>)  "Both hands could be fully extended, fists could be made and fingers could be opposed."  (<u>Id.</u>)  He could do such fine manipulation tasks as buttoning, writing, and using small tools.  (<u>Id.</u>)  The rest of his musculoskeletal examination was normal.  (<u>Id.</u>)  He appeared alert and oriented times three.  (<u>Id.</u>)  Plaintiff complained of pain in his entire spinal area.  (<u>Id.</u>)  Dr. Cason opined that his decreased back motions were attributable to his "very poor effort."  (<u>Id.</u>)  X-rays of his lumbar spine revealed no significant abnormalities.  (<u>Id.</u> at 226.)

The same day, Plaintiff had a psychological evaluation by Thomas Davant Johns, Ph.D.  (<u>Id.</u> at 230-35.)  Plaintiff was described as "nominally cooperative" and "fairly articulate."  (<u>Id.</u> at 230.)  "[H]e did not present as depressed or psychotic in any way."  (<u>Id.</u>)  He was not receiving any psychiatric treatment, had not been on any psychotropic medications after being in the penitentiary, and had never been psychiatrically hospitalized.  (<u>Id.</u>)  He did not present as "experiencing any disorganization of thinking, preoccupations or perceptual distortions."  (<u>Id.</u> at 231.)  "He is clearly not delusional or hallucinating."  (<u>Id.</u>)  Nor did he present with any hypomanic or manic symptoms.  (<u>Id.</u>)  He reported a few signs indicative of depression, including disturbed sleep, decreased energy, and decreased appetite.

(Id.)  He had "some irritability." (Id.)  He had "nothing but trivial and likely age-related difficulty with memory." (Id.)  He reported decreased concentration and loss of interest in the environment. (Id.)  He felt hopeless and helpless. (Id.)  His self-esteem might be "negative." (Id.)  He had no suicidal ideation, but did have some homicidal ideation, without any intent, two or three weeks earlier. (Id.)  He had never been married; he had four children, ranging in age from seventeen years to two. (Id. at 232.)  He reported having been fired from most of the jobs he had held, primarily due to problems getting along with his supervisors. (Id.)  He occasionally had had problems getting along with co-workers. (Id. at 232-33.)  Now, he hd trouble getting along with everyone. (Id. at 233.)  He has been arrested for robbery and assaults and been incarcerated four to five times for a total of seven to eight years. (Id.)  He was last released in 2002. (Id.)  On examination, he was "adequately groomed and casually dressed." (Id.)  His attitude was cooperative; his facial expression was alert; his motor activity was within normal limits; his eye contact was adequate; his posture and gait were within normal limits. (Id.)  He was spontaneous in his verbalizations and was coherent, relevant, and logical. (Id.)  The speed, quantity, quality and productivity of his speech were normal. (Id.)  "There was no tangentiality, flight of ideas or perseveration." (Id.)  There was also no disorganized thinking seen or reported. (Id.)  He was not suffering from preoccupations or perceptual distortions, was not delusional, and was not responding to internal stimuli. (Id.)  He was completely oriented and could recite five of six digits from memory. (Id.)  His practical knowledge and social judgment were impaired; for instance, if he discovered a fire in a crowded theater he would run. (Id. at 234.)  Although he needed

assistance getting in and out of the tub, he was able to do his own cooking, cleaning, grocery shopping, and laundry.  (Id.)  His driver's license had been suspended for failure to appear on a warrant.  (Id.)  His typical day was spent lying down and watching television.  (Id.)  He lived with his aunt, but did not do any chores for her.  (Id.)  He had a girlfriend but no friends.  (Id.)  He left the house four times a week.  (Id.)  Dr. Johns opined that Plaintiff could "complet[e] simple tasks in a timely manner over a sustained period of time, uninterrupted by psychological problems if he so desires."  (Id. at 234-35.)  His diagnosis was adjustment disorder with depressed mood, currently mild without treatment, and antisocial personality disorder.  (Id. at 235.)  His GAF was 75.[21]  (Id.)

In November 2006, Judith A. McGee, Ph.D., completed a Psychiatric Review Technique form (PRTF) for Plaintiff.  (Id. at 176-89.)  Plaintiff was described as having an affective disorder, i.e., an adjustment disorder with depressed mood, mild without treatment, and a personality disorder, i.e., an antisocial personality disorder, that were not severe.  (Id. at 176, 179, 183.)  He did not have schizophrenia, paranoia, or another psychotic disorder.  (Id. at 178.)  His two disorders resulted in mild difficulties in maintaining social functioning, but in no restrictions of activities of daily living and no difficulties in maintaining concentration, persistence, or pace.  (Id. at 186.)  Nor were there any episodes of decompensation of extended duration.  (Id.)

## The ALJ's Decision

---

[21]A GAF between 71 and 80 is described as "[i]f symptoms are present, they are transient and expectable reactions to psycho-social stressors . . . ; no more than slight impairment in social, occupational, or school functioning . . . ."  DSM-IV-TR at 34.

Analyzing Plaintiff's application pursuant to the Commissioner's sequential evaluation process, the ALJ first found that Plaintiff had not been engaged in substantial gainful activity since his application date of October 17, 2005. (<u>Id.</u> at 12.)

The ALJ next found that Plaintiff had severe impairments of sarcoidosis, an adjustment disorder with depressed mood, and an antisocial personality disorder. (<u>Id.</u>) These impairments did not, singly or in combination, meet or equal an impairment of listing-level severity. (<u>Id.</u> at 14.) His mental impairments did cause mild restrictions in his activities of daily living, moderate difficulties in social functioning, and mild difficulties in concentration, persistence, or pace. (<u>Id.</u>) They did not cause any episodes of decompensation. (<u>Id.</u>)

Addressing the question of Plaintiff's residual functional capacity (RFC), the ALJ found that his impairments precluded him from lifting more than ten pounds frequently and twenty pounds occasionally; standing and walking more than six hours in an eight-hour workday; sitting more than six hours in an eight-hour workday; climbing ropes, ladders, and scaffolds; more than occasionally climbing stairs and ramps; being exposed on a concentrated basis to extreme heat or cold and on a moderate basis to fumes, dust, and gases; working at unprotected heights; performing more than simple repetitive tasks; and having contact with the general public, more than casual contact with coworkers, and more than infrequent handling of customer complaints. (<u>Id.</u> at 14-15.) He could adapt to routine simple work changes and take the precautions necessary to avoid hazards. (<u>Id.</u> at 15.)

In reaching his conclusions about Plaintiff's RFC, the ALJ evaluated Plaintiff's credibility. (<u>Id.</u> at 15-16.) He found that Plaintiff's impairments could be expected to

produce the alleged symptoms, but that his description of the intensity, persistence, and limiting effects of those symptoms was not credible. (Id. at 15.) Detracting from his credibility was the lack of support in the treatment notes for his description; the lack of any recommendation that he not seek employment; the lack of any evidence that he required surgery, other than a lung biopsy, or prolonged hospitalization; the lack of supporting objective evidence; and the repeated evidence of noncompliance and missed appointments. (Id. at 15-16.) With his RFC, however, Plaintiff could not perform any past relevant work. (Id. at 16.)

With his age, education, and RFC, he could perform jobs existing in significant numbers in the state and national economies as described by the VE, e.g., jobs such as a small parts assembler, circuit board assembler, and packaging inspector. (Id. at 16-17.) He was not, therefore, disabled within the meaning of the Act. (Id. at 17.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 416.920; **Hurd v. Astrue**, 621 F.3d 734, 738 (8th Cir. 2010); **Gragg v. Astrue**, 615 F.3d 932, 937 (8th Cir. 2010); **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 416.920(c).  The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ."  Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations."  **Moore**, 572 F.3d at 523.  "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world."  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir.

1997) (internal quotations omitted).  Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887).  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, "'the ALJ must first evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)).  This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Id.** (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)).  "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218).  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 416.920(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones**, 619 F.3d at 972 (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir.

2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935. The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

## Discussion

Plaintiff argues that the ALJ erred in (1) his RFC findings because (a) he impermissibly gave more weight to the opinion of the consultative examiner about Plaintiff' mental impairment and functioning than that of his treating psychiatrist, Dr. Gonzalez, and (b) he did not capture the concrete consequences of his GAF of 40 and his breathing impairment, including the question of whether his asthma satisfied Listing 3.03; (2) his hypothetical question to the VE because the question included the defective RFC findings;

and (3) relying on the VE's description of the three jobs because the VE's testimony was inconsistent with the DOT.

Plaintiff's RFC. As noted above, the ALJ found that Plaintiff had the RFC to lift no more than ten pounds frequently and twenty pounds occasionally; to stand, sit, and walk no more than six hours in an eight-hour workday; to no more than occasionally climb stairs and ramps and to never climb ropes, ladders, or scaffolds; to never be exposed on a concentrated basis to extreme heat or cold and on a moderate basis to fumes, dust, and gases; to not work at unprotected heights; to perform no more than simple repetitive tasks; and to have no contact with the general public, no more than casual contact with coworkers, and no more than infrequent handling of customer complaints. He could adapt to routine simple work changes and take the precautions necessary to avoid hazards.

Plaintiff contends that the ALJ erred in his RFC findings by not giving the opinion of his treating psychiatrist, Dr. Gonzalez, greater weight than that of the consultative psychologist, Dr. Johns.

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'" **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the

record as a whole." **Wagner**, 499 F.3d at 849 (internal quotations omitted). Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" **Id.** (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)). "'Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence.'" **Id.** (quoting Prosch, 201 F.3d at 1014).

Title 20 C.F.R. § 416.927(d) lists six factors to be evaluated when weighing opinions of treating physicians: (1) the examining relationship; (2) the treatment relationship, including the length of the relationship, the frequency of examination, and the nature and extent of the relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors, e.g., "the extent to which an acceptable medical source is familiar with the other information in [the claimant's] case record." 20 C.F.R. § 416.927(d)(1)-(6).

Plaintiff was seen once, in July 2006, for one hour by Dr. Gonzalez. He was seen once, in December 2005, for forty-five minutes by Dr. Johns. Neither saw Plaintiff again. Thus, consideration of all but the third and fourth factors weigh in favor of each report equally. Dr. Gonzalez noted that Plaintiff had been having auditory and visual hallucinations for ten years, which had been getting better, and had been treated by a psychiatrist when in prison. Both references are clearly based on Plaintiff's statements, as is clear from the caseworker's March 2006 references to Plaintiff's reported history. Neither hers nor Dr. Johns' description of Plaintiff's appearance, thought process, and orientation reflect the complained-of manifestations of a mental impairment. Moreover, Plaintiff consistently

missed appointments at the Hopewell Center and, when returning after an approximately eleven month absence, gave an explanation – he had moved to Kentucky – that was belied by his seeking and receiving local medical treatment during the same time period. Consequently, consideration of the third and fourth factors weigh in favor of Dr. Johns' report. See **Clevenger v. S.S.A.**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995) ("The weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements.").

Plaintiff also argues that the ALJ erred by not discussing Dr. Gonzalez' findings, but he did, see Record at 13, and by not acknowledging that a GAF of 45 would, according to the VE, preclude him from substantial gainful activity. The ALJ found Dr. Johns' GAF of 75 more persuasive, however, and the Eighth Circuit Court of Appeals as noted that the Commissioner "has declined to endorse the [GAF] score for use in the Social Security and [SSI] disability programs," see **Jones**, 619 F.3d at 973 (internal quotations omitted). The Commissioner "has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings." **Id.** at 973-74 (internal quotations omitted).

Plaintiff further contends that the ALJ erred in not capturing the concrete consequences of his asthma, which he argues satisfies Listing 3.03. See 20 C.F.R. Pt. 404, Subpt. P, Appx. 1. It is undisputed that Plaintiff's FEV1 reading does not satisfy Listing § 3.03A, that his symptoms do not comply with Listing § 3.03C, or that he does not have a growth impairment

as defined in Listing § 3.03D.  Rather, the question is whether his breathing impairment satisfies Listing § 3.03B.  This requires that he have asthma "[a]ttacks (as defined in 3.00C), *in spite of prescribed treatment* and requiring physician intervention, occurring at least once every 2 months or at least six times a year."  20 C.F.R. Pt. 404, Subpt. P, Appx.1, § 3.03B (emphasis added).  Medical evidence submitted in support of a claim of disabling asthma "must also include information documenting adherence to a prescribed regimen of treatment as well as a description of physical signs."  20 C.F.R. Pt. 404, Subpt. P, Appx.1, § 3.00C.

The medical evidence in the instant case fails to show that Plaintiff adhered to "a prescribed regimen of treatment" and that he continued to suffer asthma attacks "in spite of" such treatment.  Indeed, the evidence shows the opposite.  Plaintiff consistently failed to adhere to his regimen of treatment, failing to take his medication or follow through with appointments to a pulmonologist.  He is often described as being noncompliant with his medication.  When he was, he was described as improved and doing well.

Plaintiff argues that the ALJ failed in his duty to fully and fairly develop the record by not contacting his treating physicians to ask for their opinions on whether he had any restrictions.  As noted above, however, it is the claimant's duty to prove his RFC.  See **Moore**, 572 F.3d at 523.  Moreover, "[t]he ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'"  **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004)).  A crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff.  See e.g. **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that

claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

The VE's Testimony.  Plaintiff's first challenge to the VE's testimony is that it was fatally based on a hypothetical claimant that included the ALJ's erroneous RFC findings.

A properly phrased hypothetical question to a VE must "capture the concrete consequences of a claimant's deficiencies." **Porch v. Chater**, 115 F.3d 567, 572 (8th Cir. 1997).  "A hypothetical question is properly formulated[, however,] if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)).  Accord **Goff v. Barnhart**, 421 F.3d 785, 794 (8th Cir. 2005); **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999).  Any alleged impairments properly rejected by an ALJ as untrue or unsubstantiated need not be included in a hypothetical question.  **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001).  Cf. **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding for further proceedings case in which ALJ did not include undisputed, severe impairment in hypothetical question to VE). For the reasons set forth above, the ALJ's hypothetical question properly included only the concrete consequences of the impairments found to supported.

The VE testified that there were three jobs that Plaintiff could perform, each has a reasoning level of two according to the DOT. Plaintiff argues that this level is inconsistent with the ALJ's request that the VE assume that Plaintiff could, inter alia, understand, remember, and carry out simple instructions and non-detailed tasks.

A reasoning level of two requires the application of "commonsense understanding to carry out detailed but uninvolved written or oral instructions." <u>DOT</u>, 706.684-022 (4th ed. 1991). In **Renfrow v. Astrue**, 496 F.3d 918, 921 (8th Cir. 2007), the Eighth Circuit found that any possible error in a potential conflict between VE's testimony and DOT was harmless given that DOT's requirement for cited jobs of a reasoning level of three did not eliminate such jobs because they were classified as unskilled and did not appear to be complex. In **Moore**, 623 F.3d at 604, the ALJ asked the VE about a hypothetical claimant who was could carry out "simple job instructions." The Eighth Circuit noted:

> [T]he ALJ did not limit "simple" job instructions to "simple one- or two-step instructions" or otherwise indicate that [the claimant] could perform only occupations at a DOT Level 1 reasoning level. Indeed, the Level 2 reasoning definition refers to "detailed but *uninvolved*" instructions. *DOT* at 1011 (emphasis added). The dictionary defines "uninvolved" as "not involved," and in turn defines "involved" as "complicated, intricate." *Webster's Third New Int'l Dictionary* 1191, 2499 (2002). There is no direct conflict between "carrying out simple job instructions" for "simple, routine and repetitive work activity," as in the hypothetical, and the vocational expert's identification of occupations involving instructions that, while potentially detailed, are not complicated or intricate.

**Id.**

Similarly, in the instant case, the ALJ did not limit the simple job instruction criterion to those requiring only one to two step instructions. Similarly, the ALJ did not err in finding

that the jobs described by the VE, jobs requiring a reasoning level of two, could be performed by Plaintiff.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently." **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted). Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  10th  day of March, 2011.